McKENNA v. NEW YORK LIFE INS. CO.

1. APPEAL AND ERROR—NONJURY CASE—EVIDENCE.
   On appeal in a nonjury law case the Supreme Court does not reverse unless the evidence clearly preponderates in the opposite direction.

2. INSURANCE—PARALYSIS—ACCIDENT—PROXIMATE CAUSE OF DEATH.
   In nonjury action to recover double indemnities under life insurance policies because death of insured is alleged to have resulted ''directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means'' and not ''from infirmity of mind or body, from illness or disease'' finding of trial judge that insured, who had been partially paralyzed for some eight years preceding, died from accident with *sequelae* of fractured femur, gangrene, amputation of leg, and pulmonary embolism, rather than hypertension, *held*, established by testimony.

3. SAME—PROXIMATE CAUSE—TERMINAL DISEASE—ACCIDENT—QUESTION FOR TRIER OF THE FACTS.
   In action under policy insuring against death resulting directly and independently of all other causes, from bodily injuries sustained through purely accidental means, if several causes concur to produce death and each claim can be supported by competent evidence, the presence of a terminal disease at the time of a fatal accident does not bar recovery as a matter of law, the case being one for the trier of the facts.

4. SAME—ACCIDENT—PROXIMATE CAUSE.
   Under policy insuring against accidental death and expressly excluding liability for death resulting directly or indirectly from bodily infirmity, illness or disease, the accident itself must have been sufficient to cause death.

5. APPEAL AND ERROR—ACCIDENT INSURANCE—TERMINAL DISEASE—CAUSE OF DEATH—QUESTION FOR TRIER OF THE FACTS.
   In nonjury action on policy insuring against death resulting, directly and independently of all other causes, from bodily in-

juries sustained through purely accidental means, for death of insured from fractured femur sustained in a fall, followed by gangrene, amputation of leg, and pulmonary embolism, whether presence of a terminal disease at time of accident barred recovery was for trial judge.

6. Same—Questions Reviewable—Proofs of Loss Required by Accident Insurance Policy.

In nonjury action for double indemnities for accidental death of one insured under life insurance policies, where counsel agreed at pretrial hearing to try the case on the merits, the answer does not appear to rely on failure to furnish any proof of loss as required by the policy, record does not contain such proof of loss as was made, and defendant admitted that proof of death was furnished, its contention that plaintiff widow failed to supply defendant with proof that death resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means was without merit (Court Rule No. 23, § 4 [1945]).

Appeal from Wayne; Murphy (George B.), J. Submitted January 11, 1946. (Docket No. 72, Calendar No. 43,206.) Decided April 1, 1946. Rehearing denied June 3, 1946.

Assumpsit by Bertha G. McKenna against New York Life Insurance Company on double indemnity provisions of life insurance policies. Judgment for plaintiff. Defendant appeals. Affirmed.

*Miller & Knowles* (*Ralph E. Helper,* of counsel), for plaintiff.

*Armstrong, Weadock, Essery & Helm* (*Richard G. Eubank,* of counsel), for defendant.

Boyles, J. Plaintiff is the widow of one Edward B. McKenna and the beneficiary in four life insurance policies issued by the defendant insurance company in which Edward B. McKenna was the insured. Upon his death the company paid the single indemnities provided for in the policies but refused to pay

the double indemnities for accidental death. The four policies are identical in so far as the questions here involved are concerned, and provide for the payment of double the face of the policies if the death of the insured resulted from accident as defined in the policies. Double indemnities were to be paid upon receipt of due proof that "the death of the insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means. * * * Double indemnity shall not be payable if the insured's death resulted * * * directly or indirectly, from infirmity of mind or body, from illness or disease."

The insurance company claimed that death resulted at least in part from an infirmity, a paralyzed condition of the left side of the insured caused by a "stroke." Plaintiff, claiming that death resulted from a fall on a wet floor, causing a fractured femur, gangrene and amputation of the left leg, brought the instant suit to recover the double indemnities. The case was heard by the circuit judge without a jury, and plaintiff had judgment from which the defendant appeals.

According to the record, the four policies were issued April 7, 1936. However, each policy contains a provision stating that the policy "takes effect" May 17, 1927, March 2, 1928, August 22, 1929, respectively, at which time (1927–1929) it seems to be assumed that Mr. McKenna was under no disability. In 1934 he suffered a stroke caused by a cerebral thrombosis which resulted in a paralysis of his left side and leg. For about two years he was hospitalized part of the time, and thereafter for the next six years preceding the accident in 1942 he had no medical attention except for occasional short periods of hospitalization for checkup. However, his paral-

ysis continued until his death, and he walked with a cane. For the last three years before his death he had no medical attention or hospitalization until his accident in August, 1942. He lived at home, worked in his garden, did practically all the work about the house while his wife was employed. In 1938 he took a trip to Mexico by himself and stayed there several months. It was his custom to wash the kitchen, bathroom and hall floors daily except Sunday, while his wife was at work. On August 24, 1942, he slipped and fell on the wet floor as he was coming out of the bathroom, apparently as he was hurrying to open the front door of the house for his wife as she returned from work. He was immediately taken to a hospital where it was found that he had a comminuted fracture of the femur of his left leg at the hip joint. He was put into a Thomas splint, in four or five days changed to a plaster of paris cast with a Jones traction splint, and on September 2d he was discharged from the hospital and taken home by ambulance. A gangrenous condition developed, on September 9th he was returned to the hospital, on October 9th his left leg was amputated between the knee and the hip, and he died five days later.

The trial judge decided that the death of the insured ''resulted from accident'' as defined in the policies, namely, ''directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means.'' Inasmuch as this is a law case heard by the trial court without a jury, we do not reverse unless the evidence clearly preponderates in the opposite direction.

Five physicians and surgeons were sworn and testified for the plaintiff and two for the defendant. They were all eminently qualified to draw conclu-

sions and express their opinions as to whether Mr. McKenna died from a coronary thrombosis as the result of paralysis or arteriosclerosis, or from a pulmonary embolism as the *sequelae* of the accident, gangrene, and the amputation of his leg. The doctors disagreed, and the case comes to court to find the answer. We examine the record to determine whether the evidence clearly preponderates in favor of the defendant, requiring reversal.

Dr. Berke, an experienced physician and surgeon who attended Mr. McKenna, testified that his patient's foot showed a cyanosis, that the blood vessels in his foot were slightly thrombosed; that thrombosis is a blocking of an artery or vein by a clot; that when it breaks away it is called an embolism; that it was common for a thrombosis to follow a fracture; that if a thrombosis blocks a blood vessel gangrene may follow; that after an amputation there is danger of embolism; that embolism can travel to any part of the body; and that he felt that the embolism caused Mr. McKenna's death. He further testified that in his opinion the fact that Mr. McKenna had been suffering for eight years with a partial paralysis due to a stroke had no relationship or causal connection between the break and the patient's gangrene and thrombosis, and that there was no relationship between the paralysis and the cause of death.

Dr. Wilson, a physician with upwards of 40 years' experience and a member of the staff of St. Mary's hospital, was called to see Mr. McKenna in the hospital as a consultant. He testified that he suggested an amputation, that in his opinion there was a localized thrombosis, and in answer to a hypothetical question stating fully the facts and circumstances (to which no objection was made) he testified:

"Well, I think in the first place, of course, the fracture was the exciting cause, caused disturbance

of the blood vessels of the leg, and if it followed the history of cases of this type, the way he died, the chances are he had a piece of thrombus arising in a vein go up in his lung causing embarrassment there, and death thereby.''

On examination by the judge he further testified that he believed there was a thrombosis present in this patient following the fracture and that in his opinion there was no causal connection between the thrombosis and the paralyzed condition.

Dr. Freeman, with upwards of 20 years in surgery, four years in Receiving hospital, two of which were as chief resident surgeon specializing in surgery associated with accidents, after examining the records of St. Mary's hospital and in answer to a hypothetical question similar to that answered by Dr. Wilson, testified (without objection) that in his opinion Mr. McKenna's death was caused by thrombosis of the femoral vessels of the left side with a pulmonary embolism, that such a condition resulting from the fracture could cause death, and that in his opinion there was positively no relationship between the paralysis and the thrombosis.   He testified:

''To my way of thinking, the damage the man received to the blood supply was produced by the trauma to the intima, which produced thrombosis, which produced gangrene, which required amputation of the gangrene and breaking off of a piece of the clot causing death.   That had no relationship, no bearing whatsoever, in my opinion, to his trouble some eight years before, but was entirely due to the trauma of, I think, August 24, 1942.''

The hospital record was introduced showing final diagnosis of multiple thrombosis, signed by Dr. Blodgett, the attending physician.   Dr. Blodgett, later called as a witness by the defendant, testified that he performed the amputation, that he later was

present at the time of Mr. McKenna's death, and that the patient's heart stopped a few seconds before the breathing stopped, which would ordinarily be considered a circulatory death, primarily due to a heart or circulation involvement. In other words, this would support the defendant's theory that death resulted from coronary thrombosis rather than from pulmonary embolism. Dr. Blodgett further testified:

"In any operation, the part that is operated on is traumatized and that trauma can cause thrombosis. As a result of the thrombosis an embolus might follow, an embolus might break away. In a large sense, all clotting which occurs after operation is thrombotic. There is really no distinction between clotting of a cut artery and a thrombosis and when a vein is cut likewise clotting or thrombosis occurs, and a piece of thrombus in the vein may get loose and travel around."

Dr. Baer, called as a witness by the plaintiff, and Dr. Freund, clinical professor of medicine at Wayne university since 1912 or 1913, called as a witness by the defendant, both testified at length as to the consequences following an amputation, dry and wet gangrene, pulmonary embolism, vascular injury, peripheral vascular diseases, coronary thrombosis, and the effects of arteriosclerosis and paralysis. The testimony of all the medical men indicates a difference of opinion among them as to whether Mr. McKenna died from a pulmonary embolism resulting from the accident, gangrene and amputation, or from coronary thrombosis caused by arteriosclerosis resulting from age or from the paralysis. Dr. Haking, connected with St. Mary's hospital, called as a witness by the plaintiff, testified that he had seen Mr. McKenna in the hospital from September 9th to October 14th, that he noted everything

that was wrong with the patient, that he made the certificate of death and gave the cause of death as pulmonary embolism.

The foregoing is only a brief review of the testimony in the case. The trial court reached the following conclusion:

"In the instant case, I find from the testimony that on August 24, 1942, the insured met with an accident, as above stated; that as a direct result of that accident, the insured suffered a thrombosis impairing the arterial circulation in his left leg, resulting directly in gangrene, and that as a result of the gangrene the patient's leg was amputated, which, in turn, resulted in a thrombosis, resulting directly in causing the insured's death by pulmonary embolism.

"I find that although the insured for some years prior to the date of the accident was suffering from partial paralysis as a result of a cerebral hemorrhage, that there is no causal connection between his death and said partial paralysis.

"I further find that although the insured had been suffering from hypertension, that is, high blood pressure, in a moderate degree for some years prior to the accident, that such impairment has no causal connection between the accident and the resulting death of the insured.

"In other words, I find that the testimony establishes, by a preponderance of the evidence, that Edward B. McKenna, the insured, died from pulmonary embolism, and not coronary thrombosis; that the cause of death, pulmonary embolism, was brought about by the amputation of his left leg; that the left leg was amputated because of its gangrenous condition, which in turn was caused by the injury to the arterial circulation of the patient, itself caused by the comminuted fracture of the left hip.

"At the trial, the court was aided by the testimony of some outstanding physicians and surgeons. As in most lawsuits, there was some conflict in the testimony. However, after listening to the various witnesses, the arguments of counsel, and aided by their briefs, it is my considered judgment that plaintiff has shown by a preponderance of the evidence that the insured died as the result of an accident within the meaning of the policies, and therefore that she is entitled to judgment under the double-indemnity clause of said policies."

We are in accord with the findings. The evidence affirmatively establishes that the accident with the *sequelae* of gangrene, amputation, and pulmonary embolism was sufficient to cause the death and that bodily infirmity or disease was not a contributing cause to the death. The defendant claims that the infirmity contributed to the *accident,* and for that reason plaintiff cannot recover. The precise question is, did Mr. McKenna's *death* result directly and independently of all other causes, from *bodily injury* effected solely through external and accidental means? On the contrary, did Mr. McKenna's *death* result directly *or indirectly* from infirmity of mind or body (paralysis or arteriosclerosis)? This is a question of fact, depending on the evidence adduced, answered by the trial court in the negative. See *Thirkill* v. *Kansas City Life Ins. Co.,* 278 Mich. 588. The case at bar comes within our recent decision in *Bristol* v. *Mutual Benefit Health & Accident Ass'n,* 305 Mich. 145, where we reached the following conclusions (syllabi):

"In action under policy insuring against death resulting directly and independently of all other causes, from bodily injuries sustained through purely accidental means, if several causes concur

to produce death and each claim can be supported by competent evidence, the presence of a terminal disease at the time of a fatal accident does not bar recovery as a matter of law, the case being one for the trier of the facts.

"Under policy insuring against accidental death and expressly excluding liability for death resulting directly or indirectly from bodily infirmity, illness or disease, the accident itself must have been sufficient to cause death.

"In nonjury action on policy insuring against death resulting directly and independently of all other causes, from bodily injuries sustained through purely accidental means, for death of insured from brain concussion sustained in a fall, whether presence of a terminal disease at time of fatal accident barred recovery was for trial judge."

The defendant further contends that the plaintiff failed to furnish the insurance company with proof that the death resulted directly and independently of all other causes, from bodily injury effected solely through external, violent and accidental means. The record does not contain such proof as was furnished, although defendant admits that proof of death was furnished. Nor does defendant's answer to the declaration set up that the defendant relies on any failure to furnish any proof of loss as required by the policy, or set up the facts showing the nature of the defense thus relied upon, as required by Court Rule No. 23, § 4 (1933), in effect at the time of trial (*id.* Court Rule No. 23, § 4 [1945]). Furthermore, at the pretrial hearing before the court, counsel agreed "to try the case on the merits as to whether or not the plaintiff is entitled to recover under the insurance policy on which the action is brought for the double indemnity feature; that is whether or not the deceased came to his death as the result of an

accidental injury within the meaning of the policy." We find no merit in this present contention.

Judgment affirmed, with costs.

BUTZEL, C. J., and CARR, BUSHNELL, SHARPE, REID, NORTH, and STARR, JJ., concurred.