**Helen J. VAN HOOK, Plaintiff,**

v.

**AETNA LIFE INSURANCE CO., et al., Defendant.**

**Civ. No. 81–70018.**

United States District Court, E.D. Michigan, S.D.

Sept. 8, 1982.

---

Barton W. Morris, Detroit, Mich., for plaintiff.

Robert P. Young, Jr., Detroit, Mich., for Aetna and Metropolitan.

F. Peter Blake, Mount Clemens, Mich., for American Motorists.

## MEMORANDUM OPINION

RALPH M. FREEMAN, District Judge.

In this civil action, plaintiff seeks to recover accidental death benefits under three separate insurance policies for the death of her husband. Plaintiff asserts that she is entitled to the benefits because the decedent accidentally drowned in a hotel swimming pool. Defendants contend that plaintiff is not entitled to accidental death benefits because the decedent died as a result of fatal heart diseases which led to heart failure in the swimming pool.

The case was tried by the Court. In addition to testifying herself, plaintiff called as witnesses Larry Wright, her husband's supervisor, and Dr. Werner Spitz, a forensic pathologist. Plaintiff also introduced the deposition testimony of Monica Clements and a written statement of Roy Brightharp. Defendants called as their only witness Dr. Charles Hirsch, the forensic pathologist who performed the autopsy. After careful consideration of all the testimony and all the exhibits received into evidence, the Court makes the following findings of facts and conclusions of law as required by Fed.R.Civ.Pro. 52.

The decedent, Leon Van Hook, was insured for accidental death benefits under three separate insurance policies. The plaintiff, Helen J. Van Hook, is the named beneficiary under each policy. The first policy was issued by defendant Aetna Life Insurance Co. (Aetna) in the amount of one hundred thousand dollars. The second policy was issued by defendant Metropolitan Life Insurance Co. (Metropolitan) in the amount of fifty thousand dollars. The third policy was issued by defendant American Motorists Life Insurance Co. (American Motorists) in the amount of fifty thousand dollars.

 Under Michigan law,[1] the burden of proof on a party seeking to recover under an insurance policy is determined by the provisions of the policy. The policies issued by Aetna and Metropolitan contain both a sole cause clause and an exclusionary clause. When a policy contains an exclusionary clause alone or in conjunction with a sole cause clause, plaintiff bears the burden of proving by a preponderance of the evidence that the accident alone was sufficient to cause death and that death was suffered directly and independently of all other causes. *See Scharmer v. Occidental Life Ins. Co.*, 349 Mich. 421, 84 N.W.2d 866 (1957); *McKenna v. New York Life Ins. Co.*, 314 Mich. 304, 22 N.W.2d 376 (1946); *Bristol v. Mutual Benefit Health & Accident Ass'n.*, 305 Mich. 145, 9 N.W.2d 38 (1943). An exclusionary clause precludes recovery where death results from a pre-existing disease or from a combination of accident and pre-existing disease. *Berger v. Travelers Ins. Co.*, 379 Mich. 51, 149 N.W.2d 441 (1967). Plaintiff must establish that the death was caused solely and exclusively by the accident and was not caused directly, indirectly, wholly or partly, by disease. *See Berger v. Travelers Ins. Co., supra.* In this case, plaintiff must satisfy this burden in order to recover under the policies issued by Aetna and Metropolitan.

 The policy issued by American Motorists does not contain either a sole cause clause or an exclusionary clause. When a policy does not contain these clauses, plaintiff bears the burden of proving by a preponderance of the evidence that the deceased sustained an accidental injury that was the efficient proximate cause of death. A pre-existing disease does not preclude recovery if death results from a combination of accidental injury and the pre-existing disease. *See Koycheff v. Mutual Benefit Health & Accident Ass'n.*, 305 Mich. 660, 9 N.W.2d 883 (1943); *Sanborn v. Income Guaranty Co.*, 244 Mich. 99, 221 N.W. 162 (1928); *Berger v. Travelers Ins. Co., supra.*

In this case, plaintiff must satisfy this burden in order to recover under the policy issued by American Motorists.

The evidence showed that Mr. Van Hook, who was fifty years old, was a fairly vigorous man with no physical complaints. He was employed as a technical sales engineer by Oxford Chemical Co. As part of his job, he was required to carry sample cases weighing approximately fifty pounds. He was often required to lift barrels weighing up to one hundred pounds and to push barrels weighing between four hundred and five hundred pounds. Every morning before going to work Mr. Van Hook and his wife jogged about two miles.

On August 1, 1980, Mr. Van Hook left his home at about 6:30 a.m. to travel to a sales convention of his employer. The convention was held at the Drawbridge Inn in Covington, Kentucky. From 8:00 a.m. until 5:00 p.m. Mr. Van Hook attended a sales meeting. That evening he went to a cocktail party and dinner sponsored by his employer. After dinner Mr. Van Hook's supervisor measured him for a ring for outstanding sales achievement to be awarded the following year. Afterwards, Mr. Van Hook went to a room where other salesmen and managers were talking business, singing, and arm-wrestling. Mr. Van Hook joined in these activities. Many of the salesmen and managers were drinking alcoholic beverages. Although there is no testimony that Mr. Van Hook was observed drinking at this time, two nearly-empty bottles of sherry were found in his room after his death.

There was a jazz festival in the area and the Drawbridge Inn had its indoor swimming pool open with four lifeguards on duty. The pool was forty feet long and twenty-two feet wide. It was three feet deep at the shallow end and got progressively deeper to a depth of nine feet. It was eighteen feet eight inches from the end of the pool at the deep end to the point at which the depth was six feet. A ledge that

---

1. Jurisdiction in this case is based on diversity of citizenship under 28 U.S.C. § 1332. The parties stipulated that Michigan law applies.

was about two feet wide was recessed at a depth of three feet along the two longest sides of the pool. Larry Wright testified that it was difficult to get footing when climbing out of the pool because the bottom curved up as it approached the side wall.

At approximately 4:00 a.m. on August 2, 1980, Mr. Van Hook was seen in his street clothes by the indoor pool at the Drawbridge Inn. He left the pool and returned a short time later in his swimming trunks. Mr. Van Hook entered the pool and talked to Dale and Monica Clements and Pat Baskerville, who were already in the pool. Neither Monica Clements nor Roy Brightharp, who was also in the pool, observed any indication that Mr. Van Hook was drunk or inebriated when he entered the pool. For approximately fifteen minutes Mr. Van Hook taught Monica Clements how to swim underwater. After the swimming instructions, Dale and Monica Clements and Pat Baskerville left the pool and joined a group of people sitting at a poolside table. Roy Brightharp and Elmer Percital remained in the pool for approximately fifteen minutes after Monica Clements and the others left the pool. Mr. Brightharp observed that Mr. Van Hook could swim. He saw Mr. Van Hook swimming back and forth the length of the pool, sometimes underwater.

For a period of approximately twenty minutes after Monica Clements left the pool, no one, including the four life guards, Mrs. Clements and her party, and Elmer Percital and Roy Brightharp, observed anything unusual or noticed that Mr. Van Hook was missing. Monica Clements and the other persons sitting at her table could observe anyone who went into or got out of the pool. The four lifeguards were talking to and drinking with the guests at the poolside tables. For part of the time, the lifeguards were not seated in the proper viewing area. They could not view the entire pool, particularly the bottom, from the area where they were socializing with the guests.

Approximately twenty minutes after Monica Clements left the pool, one of the lifeguards noticed that Mr. Van Hook lay motionless on the bottom of the pool at the deep end. The lifeguard jumped into the pool and retrieved him. The lifeguard swam with the unconscious Mr. Van Hook from the deep end to the shallow end of the pool. Mr. Van Hook was removed and placed on the pool deck. His stomach was swollen and noticeably larger than it was when he went into the pool. The lifeguards immediately attempted to resuscitate Mr. Van Hook and a large amount of water came out of his mouth. The resuscitation efforts were unsuccessful. Mr. Van Hook was pronounced dead on arrival at the hospital.

At approximately 11:00 a.m. on August 2, 1980, Dr. Charles Hirsch, Deputy Coroner for Hamilton County, Ohio, performed an autopsy on the body of Mr. Van Hook. Based on the findings he made at the autopsy, Dr. Hirsch concluded several days later that the cause of death of Mr. Van Hook was hypertensive and arteriosclerotic cardiovascular disease.

During the trial, plaintiff called Dr. Werner Spitz, a forensic pathologist, as an expert witness. Dr. Spitz testified that it was his opinion that Mr. Van Hook died solely as a result of drowning in the pool. Defendants called Dr. Hirsch as an expert witness. Dr. Hirsch testified that it was still his opinion that Mr. Van Hook died from hypertensive and arteriosclerotic heart disease and not drowning. Although at the time of the autopsy Dr. Hirsch did not have available all of the information which Dr. Spitz subsequently reviewed, Dr. Hirsch's opinion at the trial was based on essentially the same information which formed the basis of Dr. Spitz's opinion.[2] Nevertheless, the two experts reached directly contradictory medical opinions about the cause of Mr. Van Hook's death.

---

2. Dr. Hirsch physically observed the body in preparing his pathological diagnosis. Dr. Spitz reviewed those findings and reviewed slides of sections of Mr. Van Hook's heart prepared by Dr. Hirsch. Both experts reviewed statements of eyewitnesses. Dr. Hirsch also read the deposition of Monica Clements although Dr. Spitz did not. Dr. Hirsch also examined and measured the pool in which Mr. Van Hook died.

Dr. Hirsch and Dr. Spitz did agree, however, on a number of significant points concerning Mr. Van Hook's medical condition. They agreed that the pathological findings made at the autopsy reflect advanced coronary arteriosclerotic hypertensive disease which developed prior to Mr. Van Hook's death. The experts also agree that Mr. Van Hook had, in addition to arteriosclerosis and hypertension, atherosclerosis which is the most common cause of sudden death in adults of Mr. Van Hook's age and race. They agreed that one of the left coronary arteries was ninety percent obstructed, the other left coronary artery was fifty percent obstructed, and the right coronary artery was smaller than usual. They also agreed that Mr. Van Hook had hypertrophy, which is a condition associated with sudden death in a small but identifiable group of individuals. The experts agreed that these diseases are natural infirmities which are unrelated to drowning. They further agreed that persons may have these diseases and continue to live.

The experts agreed that they did not observe any recent structural change in Mr. Van Hook's heart indicating a coronary thrombosis or a myocardial infarction. The experts further agreed, however, that arteriosclerotic and hypertensive heart disease can result in an arrhythmia, which is a disturbance of the rhythm of the heart caused by a malfunction of the heart's electrical system. They agreed that an arrhythmia is a fatal condition that causes the heart to cease pumping blood to the body effectively and can result in unconsciousness in ten to fifteen seconds. They also agreed that an arrhythmia cannot be observed after death because it is an electrical event which does not cause any structural change in the heart.

The two experts agreed that there are no medical tests or findings that can conclusively establish death by drowning. They disagreed, however, about the medical standard that should be applied to diagnose drowning as a cause of death. Dr. Spitz admitted that a diagnosis of drowning can only be established when a pathologist has excluded all other probable causes of death, including the likely natural causes of death. He also admitted that a diagnosis of drowning can only be corroborated after a pathologist has evaluated all possible criteria in their entirety, especially the autopsy findings and the environmental conditions in which the victim is found. Dr. Spitz testified, however, that if a person is recovered from a body of water and there is no cause of death that can be documented as instantaneous, then it must be concluded that inhalation of water occurred causing drowning. Dr. Hirsch strongly disagreed with this standard applied by Dr. Spitz. Dr. Hirsch stated that the standard applied by Dr. Spitz is contrary to the accepted medical standard for diagnosing drowning which Dr. Spitz himself has set forth in his own article on drowning.[3] Dr. Hirsch testified that the proper standard is that a diagnosis of death due to drowning requires consideration of all the information provided by the autopsy as well as the history and circumstances surrounding the event.

The two experts disagreed about the significance of the pathological findings concerning the condition of Mr. Van Hook's heart. Dr. Spitz admitted that Mr. Van Hook had been "a very sick man" with advanced heart disease as reflected in the autopsy findings of arteriosclerosis, hypertension, and enlarged heart size. He testified, however, that he was unable to find any indication of a cause of death that was instantaneous. He stated that there is nothing to indicate a heart failure, a myocardial infarction, a coronary thrombosis, or an acute episode that would cause the heart to lapse into arrhythmia. He admitted that an arrhythmia could cause disturbance of

---

**3.** Dr. Hirsch referred to the chapter on drowning written by Dr. Spitz in the book, *Medicological Investigation of Death* (2d Ed. W. Spitz and R. Fisher, eds. 1980), which was received into evidence as Plaintiff's Exhibit 1. Dr. Spitz wrote:

> Only an evaluation of all possible criteria, especially the findings at autopsy and the circumstances in a particular case, together corroborate the diagnosis [of drowning].
> *Id.* at 360.

consciousness which would lead to inhalation of water in a person in a swimming pool. He explained, though, that he could see nothing in this case to indicate that Mr. Van Hook's heart lapsed into arrhythmia because he cannot observe an arrhythmia at an autopsy or other study. He stated that he could only observe the atherosclerosis which may cause arrhythmia.

Dr. Hirsch testified that the pathological findings reflect heart diseases that may cause arrhythmia. He distinguished between instantaneous death, which occurs within thirty seconds of the onset of symptoms, and sudden death, which occurs between thirty seconds and a few hours after the onset of symptoms. He relied on an article that he considered the most thorough study of hearts of persons who die suddenly or instantaneously from coronary disease.[4] Dr. Hirsch testified that this article documented the medical distinction between sudden and instantaneous death due to heart disease. He stated that authors of the article observed that there are no structurally demonstrable recent changes in the heart or coronary arteries of approximately ninety-five percent of the persons who die instantaneously. Dr. Hirsch stated that the overwhelming likelihood described by the study is that those persons developed arrhythmias which caused death. Dr. Hirsch considered it significant that more than one half of the persons studied who died instantaneously died during or immediately after physical exertion. He testified that the article described the pathology found in Mr. Van Hook's heart and fits the known facts about Mr. Van Hook's physical activities immediately prior to his death.

The experts also disagree about the significance of some of the circumstances sur-rounding Mr. Van Hook's death. A blood sample taken from Mr. Van Hook after his body was removed from the pool indicated a blood alcohol content of .134 mg. Dr. Spitz testified that when a person drowns in fresh water a large amount of water is absorbed into the bloodstream which dilutes the substances that circulate in the blood. He stated that the blood alcohol level of Mr. Van Hook could have been as high as .18 mg. before he drowned because the blood alcohol level can be diluted up to one-third when a person drowns in fresh water. Dr. Spitz testified that a blood alcohol content of .134 mg. would result in significant reduction of critical judgment, lack of recognition of danger, easier confusion, and slowed reaction time. Dr. Hirsch agreed that the level of alcohol in Mr. Van Hook's blood was sufficient to cause impairment of coordination, reflexes, and judgment. Dr. Hirsch also stated, however, that it would not cause a person to lose consciousness unless he was unusually susceptible to the effects of alcohol. He stated that it would not have caused incapacitation in the pool which would have made a person unresponsive to submerging in water. Dr. Hirsch observed that Mr. Van Hook would have to have absorbed two and a third quarts of water to dilute a blood alcohol level of .18 mg. to .134 mg. He also noted that the witnesses who saw Mr. Van Hook before he submerged indicated that he was not noticeably drunk or inebriated. Dr. Hirsch concluded that although Mr. Van Hook may have been overconfident because of the effects of alcohol, he was not so intoxicated that he passed out in the water and sunk like a stone without struggling.

Dr. Spitz also testified that a person swimming underwater can lose conscious-

---

4. The article is Friedman, et al., *Instantaneous and Sudden Deaths—Clinical and Pathological Differentiation in Coronary Artery Disease,* 225 J.A.M.A. 1319–28 (1973), which was admitted into evidence as Defendants' Exhibit 3. Dr. Hirsch testified that the significant points of the study are summarized in the introductory paragraph, which reads in pertinent part:

... persons dying instantaneously differed from persons dying suddenly of coronary artery disease in that (1) they rarely experi-enced acute symptoms or exhibited acute signs before death; (2) more than half died during or immediately after physical exertion; (3) their death appeared to result from a primary arrhythmia; and (4) their hearts rarely showed an acute lesion of any kind and exhibited two old occluded coronary arteries or one old occluded left anterior descending artery.

*Id.* at 1319.

ness after a period of time because of the lack of availability of oxygen. He stated that depletion of oxygen experienced by a person swimming underwater can result in a state of semi-consciousness and the inhalation of water. Dr. Hirsch testified, however, that loss of consciousness would occur only after a prolonged period of submersion, such as in endurance contests of underwater swimming. Although Dr. Hirsch agreed that nothing in the statements of the witnesses indicated how much time Mr. Van Hook spent swimming back and forth underwater, he stated that death due to underwater endurance swimming is rare.

Dr. Spitz testified that the pathological findings showed that Mr. Van Hook's right lung weighed 905 grams and his left lung weighed 745 grams. Dr. Spitz stated that those weights reflect an accumulation of fluids, or edema, which is excessive. Although Dr. Spitz testified that fluid in the lungs means nothing in and of itself, he later modified his testimony. He stated that if this accumulation of fluids in the lungs of a person was due to arteriosclerotic or hypertensive heart disease, the person would be a sick person who was unable to go swimming. He testified that the water causing the excessive weight of Mr. Van Hook's lungs was water that was inhaled in the process of drowning. Dr. Hirsch admitted that the weight of Mr. Van Hook's lungs was abnormal. He testified, however, that the fact that the lungs are abnormally heavy is not significant in and of itself. He stated that he could not tell whether a person with abnormally heavy lungs is ill unless he knew the reason why the lungs were abnormally heavy.

Dr. Spitz testified that the presence of water in the stomach is one of the criteria that shows that death occurred by drowning because there is no way for water to get into the stomach unless it is swallowed before death. He explained that water cannot reach the stomach after death because

the esophagus is a collapsed tube which does not allow water to pass through after death. Although there is no clear evidence about the amount of water expelled from Mr. Van Hook's stomach, Dr. Spitz concluded that the presence of water in the stomach indicated that Mr. Van Hook inhaled the water while drowning. He also stated that the water in Mr. Van Hook's stomach could not have been swallowed in the ten to fifteen second period between the onset of arrhythmia and the onset of unconsciousness. Dr. Spitz admitted that he had written in his chapter on drowning that water may reach the stomach after death.[5] He referred to another section of his chapter on drowning, though, in which he wrote that no significant amount of water reaches the air sacs of the lungs after inhalation has stopped. He stated that this passage was equally applicable to water in the stomach. Dr. Hirsch testified, however, that the presence of water in the stomach is not significant because water can enter the stomach after death. He stated that the water could have entered the stomach when Mr. Van Hook was dragged from the deep end of the pool to the shallow end by a lifeguard.

The experts reached directly contradictory opinions about the cause of Mr. Van Hook's death. Dr. Spitz testified that the only thing that can be said with a reasonable degree of medical certainty is that Mr. Van Hook did not die instantaneously. He admitted that he could not exclude the possibility that Mr. Van Hook experienced arrhythmia as a result of coronary disease and then drowned. He explained, though, that he could not observe an arrhythmia at an autopsy or other study. Applying his standard for the diagnosis of drowning, he concluded that Mr. Van Hook drowned because the body was recovered from water and he found nothing to support a conclusion of instantaneous death. He stated that, given

---

5. In his chapter on drowning in *Medicological Investigation of Death* (2d Ed. W. Spitz and R. Fisher, eds. 1980), Dr. Spitz wrote:

From a practical standpoint, the presence of water in the lungs and stomach of a drowning victim is of no real significance. Water may well reach these organs after death. *Id.* at 353.

the conditions and circumstances surrounding Mr. Van Hook's death, there was a forty percent chance that Mr. Van Hook would have just suddenly dropped to the bottom of the pool from drowning alone unrelated to any heart problems.

Dr. Hirsch testified that Mr. Van Hook died from hypertensive and arteriosclerotic heart disease and not drowning. He admitted that the pathological findings are as consistent with death due to drowning as with instantaneous death due to arrhythmia caused by the heart diseases. Dr. Hirsch testified, though, that the evaluation of the circumstances surrounding Mr. Van Hook's death was an extremely important aspect of his analysis of Mr. Van Hook's death. Dr. Hirsch noted that eyewitnesses indicated that Mr. Van Hook appeared to know how to swim. After examining and measuring the pool, Dr. Hirsch concluded that Mr. Van Hook could never have been more than nine feet from safety, either by standing up or grabbing the side of the pool. Dr. Hirsch stated that the fact that none of the lifeguards or persons in or around the pool heard cries for help or observed anything unusual indicates that Mr. Van Hook submerged silently without a struggle or splashing. He stated that a silent submersion is precisely what one would expect if someone died instantaneously from an arrhythmia. Dr. Hirsch concluded that Mr. Van Hook submerged in the pool because he died and that he did not die because he submerged in the pool. He stated that Mr. Van Hook's submersion was an artifact of the environment in which he was when he died.

As discussed earlier, plaintiff bears the burden of proof in this case. In order to recover on the policies issued by Aetna and Metropolitan, plaintiff must establish by a preponderance of the evidence that Mr. Van Hook's death was caused solely and exclusively by accidental drowning and was not caused directly, indirectly, wholly or partly, by heart disease. In order to recover on the policies issued by American Motorists, plaintiff must establish by a preponderance of the evidence that accidental drowning was the efficient proximate cause of Mr.

Van Hook's death. In this case, however, the evidence shows that Mr. Van Hook died as a result of either drowning or heart disease. Plaintiff argues that Mr. Van Hook's death was caused solely and exclusively by drowning. Defendants argue that Mr. Van Hook's death resulted solely and exclusively from heart disease. The evidence shows that either drowning or the heart disease was sufficient to cause Mr. Van Hook's death. There is no evidence that drowning and heart disease both contributed to Mr. Van Hook's death. The evidence shows that Mr. Van Hook's death resulted from only one or the other of the two possible causes.

The dispositive issue in this case is whether the plaintiff sustained her burden of proving that it is more likely than not that the cause of Mr. Van Hook's death was accidental drowning. The two expert witnesses agreed that there are no medical tests or findings that can conclusively establish death by drowning. The plaintiff's expert witness, Dr. Spitz, concluded that Mr. Van Hook died solely as a result of drowning. Applying his standard for a diagnosis of drowning, Dr. Spitz reached this conclusion because the body of Mr. Van Hook was recovered from water and he was unable to find any indication of a cause of death that was instantaneous. Dr. Spitz conceded, however, that Mr. Van Hook had advanced coronary arteriosclerotic hypertensive heart disease. He admitted that the heart disease could result in an arrhythmia, which can cause instantaneous death. Dr. Spitz concluded that there was no indication that an arrhythmia caused instantaneous death because he could not see the arrhythmia at an autopsy or other study of the body. He conceded, however, that an arrhythmia cannot be observed after death because it is an electrical event which does not cause any structural change in the heart. Dr. Spitz did not appear to rely upon the evidence of the circumstances which surrounded Mr. Van Hook's death in reaching his conclusion. Furthermore, significant parts of Dr. Spitz's testimony were contradicted by his prior written statements

regarding the diagnosis of drowning. Although Dr. Spitz concluded that the cause of Mr. Van Hook's death was accidental drowning, he admitted that he could not exclude the possibility that Mr. Van Hook's death was due to heart disease.

Defendants' expert witness, Dr. Hirsch, admitted that he could not exclude the possibility that Mr. Van Hook accidentally drowned. He concluded, however, that the cause of Mr. Van Hook's death was an arrhythmia resulting from his heart disease. Dr. Hirsch based his conclusion upon the pathological findings of heart disease, a medical study of death due to coronary artery disease, and a consideration of the history and circumstances surrounding Mr. Van Hook's death.

After careful consideration of the testimony of the expert witnesses and all the other evidence in this case, the Court concludes that plaintiff has failed to sustain her burden of proving by a preponderance of the evidence that Mr. Van Hook accidentally drowned. Although the evidence shows that it is possible that Mr. Van Hook died as a result of drowning, plaintiff has failed to produce sufficient evidence which, when considered with all the other evidence, shows that it is more likely than not that the cause of Mr. Van Hook's death was accidental drowning. The Court finds that Dr. Hirsch's testimony is credible evidence that shows that Mr. Van Hook did not accidentally drown. After weighing all the evidence, the Court finds that the medical facts and circumstances of Mr. Van Hook's death are as consistent with death due to the malfunctioning of Mr. Van Hook's heart as a result of heart disease as with death due to drowning.

Therefore, for the reasons stated herein, judgment will be granted to the defendants. An appropriate order shall be submitted.